IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | 2:19cr182 |
| | ) | **Electronic Filing** |
| **LYNN HARGRAVES** | ) | |

## <u>OPINION</u>

On June 19, 2019, a grand jury returned a one-count indictment against Lynn Hargraves ("defendant"), charging him with possession with intent to deliver quantities of fentanyl, heroin and cocaine base (in the form commonly known as crack), on or about May 15, 2019, in violation of Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(C). Presently before the court is defendant's motion to suppress. Defendant challenges the lawfulness of the issuance and execution of a search warrant under the particularity clause of the Fourth Amendment. An evidentiary hearing was held on the motion on August 3, 2021, after which the parties filed supplemental submissions on September 20, 2021, October 4, 2021, October 11, 2021 and October 14, 2021. After review of the parties' post-hearing submissions, the court determined that conducting a view of part of the searched premises would be helpful to the court's understanding of the evidence and the factfinding to be undertaken in conjunction therewith. It informed the parties of its intent to take a view at a supplemental hearing held on November 23, 2021. <u>See</u> Doc. No. 67. A view of the premises was then taken on December 10, 2021. <u>See</u> Doc. No. 72. After careful consideration of the entire record as developed, defendant's motion to suppress will be granted.

The charge stems from an investigation of defendant by Pittsburgh Police officers working out of Zone 5, which includes the Homewood, Garfield, East Liberty, Larimer, and Bloomfield sections of the City of Pittsburgh. Hearing Transcript (Doc. No. 56) at p. 5, lines 24-5 ("Tr. at 5:24-5"). The investigation quickly became centered on defendant's residence at 7224 Idlewild

Street, which is in the Homewood section of the City ("the residence").  Tr. at 8:16-18.  The

residence is in a high crime area in part because it is in close proximity to Frankstown Avenue,

which is an "open-air" market for drug distribution.  Tr. at 9:1-8.  Arrests for drug distribution

and violent street crime occur in the neighborhood frequently.  Id.

 The investigation unfolded rather quickly on morning of May 15, 2019.  Officers Celena

Celender and Neyib Velazquez were informed by a confidential informant ("CI") that defendant

was selling drugs out of the residence.  The CI informed the officers that he had bought drugs

from defendant at the residence and that defendant lived on the third floor of the residence.  Tr.

93:3-4; 139:23-25.  He also indicated that defendant drove a green Jeep that was parked in the

street at the residence.  Tr. at 10:6-10; 92:22-25.  The CI did not impart information about

whether other individuals also were living in the residence or whether it contained multiple

living units.  Tr. at 93:5-9; 140:1-8.

Officers Celender and Velazquez notified their superior officers, who coordinated with the

narcotics detectives in Zone 5.  Tr. at 93:10-14.  This coordination brought Detectives Sapp and

Dettling and Sergeant Baker into the investigation.  Tr. at 93:15-17.  Collectively, the officers

formulated a plan to conduct the investigation, which included conducting surveillance of the

residence.  Tr. at 9:15-20; 93:11-20.  Detective Dettling checked the registration of the Jeep,

which verified that it was registered to defendant at "7224 Idlewild Street, Apartment 3."  Tr. at

10:6-10.  He also checked the address on the Allegheny County real estate portal as well.  Id.

Officers Celender and Velazquez set up surveillance of the residence.  Tr. at 93:21-24.

They positioned themselves down the street where they could see the front of the house from an

angle but were not conspicuously parked in a manner that made them noticeable to pedestrians or

motor vehicle traffic.  Tr. at 94:2-11.  They then witnessed a number of individuals approach the

residence, go to the front door, enter into the house, and then exit within two to five minutes

later.  Tr. at 95:17-21.  The duration of time the callers were inside the residence suggested to the officers that drug transactions were occurring in the front foyer/main entryway into the house. Tr. at 95:17-24; 142:4-12.  The individuals had physical characteristics that were indicative of drug users/addicts.  Affidavit of probable Cause, Gov. Hearing Exhibit No. 4 at 2.

Detective Dettling, Officer Sapp and Sergeant Baker set up as a "take down" unit on a nearby side street.  Tr. at 14:13-15.  Officers Celender and Velazquez relayed the information from their surveillance to the take down team in real time.  Tr. at 14:17-18; 85:2-5.  The take down team stopped a vehicle containing one of the individuals who had just gone into the residence.  Tr. at 15:18-21.  When they did so, Sergeant Baker observed a single baggie containing crack cocaine in the front passenger's side door pocket directly after that individual stepped out of that side of the vehicle.  Tr. at 15:21-24.

After these events Detective Dettling returned to the Zone 5 station to begin drafting a warrant.  He was joined by Officer Sapp and Sergeant Baker.  Tr. at 84:21-24.  Officers Celender and Velazquez kept their eyes on the residence for a period of time.  During this time defendant left the residence.  Tr. at 107:2-16.  After defendant left, Officers Celender and Velazquez observed people coming into and leaving the residence.  These interactions appeared to be independent of defendant and were not indicative or suggestive of drug transactions.  Tr. at 107:17-24.  None of these individuals were stopped or questioned by the police.  Tr. at 108:9-11.

Detective Dettling and Officer Sapp relieved Officers Celender and Velazquez and took over the surveillance of the residence.  Tr. at 96:8-17.  Officers Celender and Velazquez then went back to the station to formulate a plan for executing the anticipated warrant.  Tr. at 96:8-17.

During the ongoing surveillance, Detective Dettling and Officer Sapp observed defendant walking back toward the residence.  The decision was made to detain defendant as part of a safety precaution known as a "soft grab"; the purpose of this maneuver was to assure that he did

not regain access to the residence prior to executing the anticipated search warrant.   Tr. at

140:20-24.  These officers then detained defendant as he was heading toward the residence.  Tr.

at 145:2-5.  The location of the stop was on a side street but in close proximity of the residence.

Tr. at 145:5-11.

Defendant became agitated and argumentative upon being detained.  He began to yell up

the street toward the Frankstown and North Homewood intersection to people on the corner to

"go get Ray" and have him "go to my house."  Tr. at 144:15-19.  Someone responded from a

distance and said "okay" and left the crowd in the opposite direction of the officers.  Tr. at

145:16-22.  This individual was on the adjacent street but headed in the direction that could have

resulted in the individual being able to go to the house and gain access to the residence.  Tr. at

145:19-25.  At that juncture no other officers were at the residence so Detective Dettling and

Officer Sapp returned to secure it prior to the search (which was about a block away).  Tr. at

145:23-25.  They quickly became positioned outside the front of it.  Tr. at  146:12-17.  The rear

of the house was not secure at that time.  Tr. at 146:18-19.  These officers remained there until

the search was executed.  Tr. at 146:15-17;

Defendant was detained in the back of the police vehicle under Detective Sapp's control

prior to the search.  Tr. at 153:5-9.  Sergeant Baker engaged defendant and asked whether he had

keys to the residence.  Defendant said he did not and stated that his landlord lets him in.  Hearing

Exhibit 11; Tr. at 153:24 – 154.  Sergeant Baker did not believe that defendant's landlord let him

into the residence every time he left and came back.  Tr. at 154:23-25.

After conducting the "soft grab" of defendant and returning to the residence, Detective

Dettling and Officer Sapp made a radio call for "all available units" in order to secure the

residence.  Tr.at 97:1-9; 133:20-23.  A number of units responded and surrounded the structure.

Tr. at 98:22-25.  As part of the subsequent process of securing the residence, a gate to a fenced-

off section on one side of the residence was opened and the area was secured for safety.  Hearing

Exhibit No. 7; Tr. at 28:1-4.  Once the gate was opened, the presence of three electrical meters

was revealed.  Hearing Exhibit 7.   Sergeant Marckisotto walked along side of the house within

the fenced in enclosure from the front to rear in order to secure the area.  Hearing Exhibit 7; Tr.

at 39:8-25.  In the process he noted the presence of the three separate electrical meters.  Tr. at

40:6-13.  Upon viewing the multiple electric meters, Sergeant Marckisotto asked Lieutenant

Baker if the residence was a multiple unit building.  Tr. at 42:6-21.  Lieutenant Baker brushed

Sergeant Marckisotto off and did not answer him.  Tr. at 43:1-5.  This inquiry by Sergeant

Marckisotto occurred prior to the entry into and search of the residence.  Tr. at 45:1-4.

     Within a short period of time thereafter Lieutenant Baker gave the command to the

assembled officers to knock and announce and commence with the forced entry.   Tr. at 45:23-25

– 46:1; 121:7-11.  This order was given before Lieutenant Baker had a chance to look over the

warrant, in part because the forced entry was done before the officers had a chance to formulate

an execution plan.  Tr. at 117:15-18.  Using a breaching tool akin to a battering ram, the officers

forced entry through the front door.  Hearing Exhibit 7.  There were several doors in the foyer

area that led to different locations inside the house.  Tr. at 49:4-5.  There were doors with

installed locks on each of the floors.  Tr. at 64:8-22; 101:3-5; 135:22 – 136:1.  None of the

interior doors were marked with any unit or apartment number.  Tr. at 63:21-23; 101:6-9; 136:2-

4.

     The officers proceeded to conduct a protective sweep.  In doing so they progressed from

the first floor to the third floor.  Tr. 50:24 – 51:6; 63:9-20; 101:15-18.  They used the breaching

tool to batter open each of the locked interior doors on each of the first and second floors as they

proceeded; and after the forced entry they walked through each of the areas to make sure

someone was not inside who might be armed or who might have an issue with them.  Tr. at 45:9-

16; 56:20-23; 149:23 – 150:1; 150:16 – 151:3.  The floors were cleared as the officers proceeded upward.  Tr. 50:24 – 51:6.  The walk-through was just to check for the presence of individuals; searching for evidence beyond anything they visually encountered during the walk-through was not done during this process.  Tr. at 150:16-20.  After they proceeded to "clear" the residence from the first to the top floor (i.e., the third floor), the officers then conducted "a back clear," which consisted of going back through each area that had been cleared in order to look closer for and examine any smaller places where an individual might be hiding.  Tr. at 62:24; 150:23 - 151:16-3.

Entry on the first floor revealed a living room, bedroom, bathroom and a kitchen.  Tr. at 49:9-18.  There were three locked doors on the second floor off the landing area proceeding up the stairs.  Tr. at 64:1-4; 65:4-8.  In addition to the three doors secured by locks, the second floor also contained common unlocked areas containing a kitchen and bathroom.  Tr. at 65:4-11. Entry into the three locked doors revealed they consisted of bedrooms.  Tr. at 65:19 – 66:3.

The "protective sweep" proceeded to the third floor.  Entry through the door on that floor revealed a kitchen to the front, a living area on the left that appeared to be occupied by defendant and another bedroom off to the right that did not appear to be occupied by anyone.  Tr. at 101:18-24.  The area that appeared to be occupied by defendant had a sitting area with a Lazy Boy chair and a TV.  Tr. at 101:18-21.  The area also had a TV stand table which contained utility bills with defendant's name on them and an Ipad with a "Ring Doorbell" app that kept alerting on the Ipad because of the officers' presence on the front porch.  Tr. at 102:1-17.

After the protective sweep was completed Lieutenant Baker advised the other officers of the mailboxes affixed next to the front door and raised the possibility that the residence might consist of multiple living units.  Tr. at 62:22 – 63:2; 66:23-25; 103:1-8; 116:10-19; 150:1-6. After he did so, the officers limited their actual physical search for evidence to the third floor.

Tr. at 67:11-13; 67:23-25; 103:9-11; 116:20-25; 137:7-24; 150:12-15.  Defendant's motion seeks to suppress the use of the evidence seized on the third floor.

Each officer testifying at the hearing on August 3, 2021, unwaveringly denied having any reason to believe from the facts and circumstances confronting them that the residence was a multiunit dwelling or set up as a multi-resident home.  These denials were persistent and almost uniform in explanation, notwithstanding that, as the government was forced to concede, "there [were] three mailboxes you can see clearly [affixed right next to the front door]."  Tr. at 147:17-18 (referencing Defendant's Hearing Exhibit A) .  For example, Detective Dettling denied that he saw any mailboxes while observing the residence during the pre-search operations or in conjunction with photographs of the residence taken from selected angles, which photographs had been taken for the purpose of presenting the government's case.  Tr. at 13:5 – 14:9.  He likewise denied remembering seeing any mailboxes when the team breached the front door and made entry into the residence.  Tr. at 60:4-5; 81:6-8.  And he denied seeing the mailboxes from the street at any time during the hours that pasted between his initial arrival and entry into the residence.  Tr. at 61:23-25.  The inference was raised that this was due in part to the house being several steps above street level.  Tr. at 61:16-22.  The paramount need to watch all aspects of the structure leading up to and during forced entry, and particularly the windows and doors, for safety reasons, was cited as the main reason why the mailboxes would not have been a focus or concern leading up to the forced entry and ensuing protective sweep.  Tr. at 62:4-13; 87:20 – 88:7;

Officer Celender likewise denied seeing any mailboxes while conducting surveillance.  Tr. at 94:20-23.  When asked about not seeing them during entry, she responded:

Q.  And you know, there's clear as day three mailboxes there, correct?

A.  Yes.

Q. How did you not see those mailboxes when you were going to enter into this residence?

A. I just wasn't focused on them.  I was focused more on the door and the window and anything that could be coming out of the house.

Q.  So when you're making entry into an unsecured residence in a narcotics investigation, your focus is not on mailboxes?

A.  Correct.

Tr. at 100:1-11.  On cross examination, she professed not to know whether she saw the multiple mailboxes during the surveillance and reiterated that she just "never noticed them" and "[i]t didn't draw my attention."  Tr. at 109:21-25.  The other officers provided almost identical testimony and assessments. Tr. at 117:1-3; 120:5-7; 120:23 – 121:4; 128:14-21; 130:16-20; 133:1-5 (Officer Velazquez denying seeing the mailboxes or anything on the exterior of the building indicating it was a multi-unit dwelling); 135:10-17 (Officer Velazquez denying observing the mailboxes at the time of forced entry); 147:15-20 (Detective Sapp denying seeing the three mailboxes while battering in the front door).

Officer Celender also disavowed having any concern or forming any recognition that the residence might be a multiunit dwelling from observing during surveillance that other people were entering and leaving the residence after defendant had departed from it.  She explained:

Q.  Would [other people coming and leaving the house when defendant wasn't there] necessarily indicate to you this was an apartment building?

A.  No.

Q.  Why not?

A.  Because in the area, it's common for a large amount of people to live in the house, live in separate rooms, families, not families, just people that stay there, people pay to stay for the night, anything like that.  So nothing is out of the ordinary.

Q.  And it's all sort of like a roommate situation at a house?

A.  A roommate, a rooming house, a homeless person doesn't have anywhere to sleep for the

night.

Tr: at 109:1-12.

And other officers gave similar explanations when questioned about whether

encountering multiple locked interior doors immediately upon entry raised an inference or

concern that the residence might be a multiunit dwelling.  For example, Detective Velazquez

explained why encountering multiple interior locked doors did not indicate to him that

the residence was a multi-unit building:

A.  We usually go into a lot of houses like this, there are different locks on different doors.

There's no indication of anyone being there.  That's what we usually encounter in

Homewood.

Tr. at 136:5-11.

Detective Sapp provided essentially the same explanation:

Q.  So then once you entered the residence, we see it on the body cam, there are a number of

locked doors in the interior?

A.  Yes.

Q.  Why did that not signify to you that this might be a multi-unit dwelling?

A.  In this area specifically that I've worked in for five years, I've come across dozens, if not

more, houses that people just rent rooms off of and put their own locks on, or I've even run

into single family homes that have people that just lock their doors like that.  There was no

markings on the door, there's no way for me to really tell what belongs to who.

Tr. at 148.  Detective Dettling echoed similar explanations, Tr. at 64:8-22, as did Officer

Celender, Tr. at 101:3-13.  Questioning about the three electrical meters was met with the same

type of testimony.  Tr. at 28:1-17 (Detective Dettling denying being aware of multiple electrical meters at any point prior to observing them on body camera footage in part due to a privacy fence); Tr. at 40:1-22 (Sergeant Marckisotto recalling his viewing of the three electrical meters while traversing inside the fence to secure the outside of the residence prior to entry and acknowledging that the three meters could indicate a multi-unit dwelling but further indicating that "[i]t depends on how the landlord has the structure either divided or the lease agreement" drawn up); Tr. at 41:12-20 (Sergeant Marckisotto explaining that just because there is a landlord and tenant arrangement "doesn't specifically mean there's apartments inside of that residence.").

 A central issue raised by defendant's motion and the parties' development of the record is whether the officers involved in the investigation knew or should have known at the time they applied for a warrant that the place to be searched pursuant to the anticipated authorization consisted of a multiunit dwelling containing a number of apartments or living units as opposed to a single residential house.  The peculiar angles of the photographs and selected video footage presented coupled with the officers' collective discounting of any of the objective facts and circumstances that suggested the residence very well could have been a multiunit dwelling raised a serious question as to their credibility and the reasonableness of their assessments with regard to viewing and assessing the available objective factors relating to the character of the residence. The similarity of their testimonial accounts and explanations was remarkable and the content of the same had a fairly uniform and undeviating composition, further raising questions about what a reasonable officer would have known or should have known under the circumstances.  And further reflection underscored the importance of how obscured or easily detected the mailboxes were from the front sidewalk and a street level view of the residence by the human eye as opposed to what appeared through images in shadowed areas captured through a lens.  In light of

this state of affairs, this member of the court reopened the record and conducted a view of the residence.

As documented in the record, on December 10, 2021, the court conducted a view of the residence, which is 7224 Idlewild Street, Pittsburgh, Pennsylvania, and is located in the Homewood section of the City.  Counsel and defendant were physically present during the entirety of the view.  The view encompassed looking at the front façade of the building from inside the vehicle upon arrival (looking out the back-seat passenger-side window), and then viewing the building from the street, the street curb and the public sidewalk in front of the house. The details of the front porch and sides of the house also were observed.  Based on the view, the court makes the following findings of fact:

1) The three mailboxes that can be seen in the photographs and body-camera video were still present on the front porch on the day of the view;[1]

2) The three mailboxes that can be seen in the photographs and body-camera video were in the same physical location on the front façade of the house where they were on the day of the investigation and search;

3) The specific location of each mailbox is the same as the location depicted in the photographs and body-camara footage introduced at the August 3, 2021, hearing;

4) The three respective mailboxes are the same size and shape as those depicted in the photographs and body camara footage introduced at the August 3, 2021, hearing;

---

[1]  A fourth mailbox had been added in the same general location on the front façade of the residence, but in a space where no mailbox was located on the day of the investigation and search.  This fourth mailbox contained markings indicating it was designated for and identified as apartment number 4.

5)  Each mailbox is designated for and identified by markings as a separate apartment or unit within the house (e,g., "APT # 1");[2]

6)  The house does have support pilers holding up the roof over the front porch and a slightly extruding column creating a right-angle with the front façade at the edge of the porch where the mailboxes are located, but there is no part of the front of the house or the front porch that would obstruct or impede in any significant way a visual verification that there are (and were) multiple mailboxes affixed to the front façade of the house when viewed from the front of the house where the private sidewalk joins the street sidewalk and/or from the street curb just beyond that location;

7)  The markings or designations on the mailboxes that are intended to supply a United States Postal Service address for an apartment/different unit within the house likewise can be detected when viewed from the front of the house where the private sidewalk joins the street sidewalk and/or from the street curb just beyond that location;

8)  The collection of mailboxes is readily and easily viewed from inside a vehicle upon approaching the front of the house and for at least several feet while traversing up to the residence and for at least several dozen feet proceeding past the house in a vehicle (proceeding toward the intersection of Idlewild and Sterrett Street);

8)  The collection of mailboxes is readily and easily viewed from the street curb as one approaches the front of the house;

9)  The collection of mailboxes is readily and easily viewed from the public sidewalk as one approaches the front of the house and for several dozen feet while traversing up to and past the house on foot (proceeding toward the intersection of Idlewild and Sterrett Street);

---

[2] The white piece of paper that can be seen on Defendant's Exhibit A containing the writing "Apartment # 1" was no longer on the mailbox for that unit; instead, that mailbox had a number "1" under or after the letters "APT" – which letters are visible in that exhibit.

10)  The collection of mailboxes is readily and easily viewed and detected when observing the front entrance door to the residence from virtually all locations where the front door can be readily and clearly observed in its entirety;

11)  There are garbage cans that are kept on one side of house near the front porch which can be seen in the body camara footage introduced at the August 3, 2021, hearing and the government's hearing exhibits 2 and 3;

12)  There was a collection of garbage cans in the same location on the day of the view;

13)  The garbage cans are or appear to be the same or substantially similar in size and shape as those depicted in the body camara footage and exhibits introduced at the August 3, 2021, hearing;

14)  The collection of garbage cans is readily and easily viewed from inside a vehicle once visual access is gained to the left side of the house (while facing it from the street) and for several dozen feet while traversing past the house on the side where they are located;

15)  The collection of garbage cans is readily and easily viewed from the street curb as one approaches the front of the house on foot;

16)  The collection of garbage cans is readily and easily viewed from the sidewalk as one approaches the front of the house on foot and for several dozen feet while traversing past the house on the side where they are located (proceeding toward the intersection of Idlewild and Sterrett Street).

Defendant contends that the warrant was invalid for lack of specificity and violated the Fourth Amendment's categorical prohibition against searches beyond the scope of the underlying probable cause supporting the warrant - as recognized in Maryland v. Garrison, 480 U.S. 79, 84 (1987).  In this regard, defendant asserts that the investigating officers knew or should have known that the residence was an apartment building and the objective information available

indicated that defendant occupied an apartment on the third floor.  And if any legitimate question existed prior to obtaining the warrant, that uncertainty was dispelled by the objective information gained prior to executing the search warrant, making the discovery of any evidence thereafter subject to suppression under United States v. Ritter, 416 F.3d 256 (3d Cir. 2005), where the United States Court of Appeals made clear that knowledge of the character of a multiunit dwelling requires that the search immediately be confined to the unit or units for which probable cause exists.  Defendant thus maintains that the officers knew or should have known of the multiunit character of the residence prior to applying for the warrant and surely knew of it prior to execution, resulting in a violation of the Fourth Amendment's particularity clause and grounds for suppression of the evidence seized from defendant's apartment.

The government maintains that the affidavit of probable cause supplied a sufficient basis for the authorizing judge (Judge Cashman of the Court of Common Pleas of Allegheny County) to conclude that probable cause existed for the requested warrant and the officers relied on that authorization in good faith.  It further asserts that the scope of the warrant was based on the information known to the officers at the time they applied for it and they acted reasonably in executing it.  In other words, the requested warrant "was valid when issued because it accurately described the structure as it was known, or should have been known, to the officers when issued."  Gov. Brief in Opposition (Doc. 33) at 12.  As a result, any ambiguity in its scope must be upheld under Ritter because their investigation supported the belief that it was a single-family residence under defendant's control.  Furthermore, the officers limited their search to defendant's third-floor apartment once they became aware of further information indicating defendant occupied only the third floor.  And the officers were permitted under the existing circumstances to conduct a protective sweep prior to that limited search in order to prevent the imminent destruction of evidence under Kentucky v. King, 563 U.S. 452 (2011), and to assure that the area

14

did not harbor an individual posing a danger to the officers under <u>Maryland v. Buie</u>, 494 U.S. 325 (1990).  Thus, the officers requested a warrant consistent with the scope of the information available to them at the time and which application reasonably was understood to be limited to the occupancy of defendant, and then reasonably executed the warrant under the circumstances as they unfolded, resulting in compliance with the Fourth Amendment as construed in <u>Garrison</u> and <u>Ritter</u>.

It has long been settled that a "warrant[ ] must 'particularly describe[e] the place to be searched and the persons or things to be seized.'"  <u>United States v. Karrer</u>, 460 F. App'x 157, 161 (3d Cir. 2012) (quoting <u>United States v. Yusuf</u>, 461 F.3d 374, 393 (3d Cir. 2006) (second alteration in original) (quoting U.S. Const. amend. IV)).  And the failure to meet this settled Fourth Amendment tenet requires the suppression of "all evidence seized pursuant to [the] general warrant."  <u>Id.</u> (quoting <u>United States v. Christine</u>, 687 F.2d 749, 758 (3d Cir. 1982).

"Indiscriminate searches and seizures conducted pursuant to general warrants . . . were the immediate evils that motivated the framing and adoption of the Fourth Amendment." <u>Christine</u>, 687 F.2d at 756 (quoting <u>Payton v. New York</u>, 445 U.S. 573, 583 (1980)).  These warrants, also known as writs of assistance in colonial times, "were issued upon 'mere suspicion' and gave customs officials blanket authority to search where they pleased for goods imported in violation of British tax laws."  <u>Id.</u> (citing <u>Boyd v. United States</u>, 116 U.S. 616, 625 (1886)).

The terms delineating the scope of the warrants' authorization "serve to limit the scope of the intrusion."  <u>Christine</u>, 687 F.2d at 756 (citing <u>Walter v. United States</u>, 447 U.S. 649, 656 (1980) and <u>United States v. Poller</u>, 43 F.2d 911, 914 (2d Cir. 1930) (Hand, J.)).  "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another."  <u>Christine</u>, 687 F.2d at 756 (quoting <u>Marron v. United States</u>, 275 U.S. 192, 196

(1927)).  It "also 'assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.'" Ritter, 416 F.3d at 265 (quoting United States v. Chadwick, 433 U.S. 1, 9 (1977) (citation omitted).

The issues raised by the parties briefing and arguments are premised on three cases. First, in United States v. Busk, 693 F.2d 28 (3d Cir. 1982), the United States Court of Appeals for the Third Circuit directly held that "[a] warrant authorizing entry into all apartments in a multiple dwelling house when probable cause has been shown for the search of only one of them does not satisfy the particularity requirement of the fourth amendment."  693 F.2d at 31 (citing United States v. Higgins, 428 F.2d 232 (7th Cir. 1970); United States v. Hinton, 219 F.2d 324 (7th Cir. 1955); United States v. Parmenter, 531 F. Supp. 975 (D. Mass. 1982)).  This is so "because the probable cause requirement would be rendered virtually meaningless if police could legally search several living units upon a mere showing that one of the units, not specifically identified, contained the contraband sought."  Ritter, 416 F.3d at 266 n.9 (quoting People v. Luckett, 652 N.E.2d 1342, 1346 (Ill. 1995) (citing Higgins, 428 F.2d at 235)).

In Busk, James Busk came under investigation after a confidential informant identified the location of 3123 Richmond Street as the site of an illegal gambling operation; surveillance of the residence was conducted for three days; Busk was observed entering the premises on each day and staying approximately one hour; and concomitant telephone surveillance revealed that the telephone was constantly busy during the hours of 11:30 a.m. and 2:00 p.m.  Id. at 29.

During the surveillance the investigating officer had observed indicia indicating the target premises was a multiunit row house where individuals other than Busk also lived.  These included three plainly visible doorbells outside the main door, which opened to a common hall and stairwell.  The investigating officer learned from a check with the gas and electric utility

companies that another individual named Herron occupied the second floor; Herron was known to be an associate of Busk.  However, Busk's name was not on the mailbox or the doorbell for the second floor.  Id. at 29-30.

In applying for a warrant, the investigating officer identified the following as the property to be searched: "3123 Richmond St., 3-story brick row home, (entire property to be searched.)."  In another section of the application the affiant identified "James Busk 44 W/M" as the owner, occupant or possessor of the premises to be searched.  When asked why he did not specify the second floor in the premises to be searched section, the officer responded: "Well, I felt that different people - I felt that maybe it wasn't the second floor - I mean for all I know, it could have been the entire property."  Id. at 30.  Based on this response, the court readily concluded that there was "no question that [the investigating officer] intended to obtain and did obtain a warrant which would permit a search of the entire multiple dwelling building."  Id.

In executing the warrant, the officers observed Busk and seized him after he initially ran.  They then went into the wrong row house and searched the second and third floors of that house.  Busk was strip searched on the second floor of that building.  Id.  After realizing they were in the wrong building, the officers went to the correct address, used keys obtained from Busk to gain access to the second floor and seized gambling paraphernalia.  Id.

The district courts had denied Busk's motions to suppress based on United States v. Bedford, 519 F.2d 650 (3d Cir. 1975), cert. denied, 424 U.S. 917 (1976).  In Bedford, the warrant had authorized the search of "1723 Fifth Avenue. Residence of Myrel Bedford and Mary Bedford (Mary Hughes)."   The Bedford court ruled that the specific refence to residence in identifying the property to be searched restricted the officers to the single apartment occupied by the Bedfords and, so construed, the description was such that the executing officer could with reasonable effort identify the precise location for which authorization had been given.  Busk, 693

F.2d at 30 (citing <u>Bedford</u>, 519 F.2d at 653 and <u>Steele v. United States No. 1</u>, 267 U.S. 498, 503 (1925)).

The <u>Busk</u> court distinguished the circumstances in <u>Bedford</u> from those before it.  Among other things, it emphasized that the description clause of the warrant in question identified the entire residence as the property to be searched.  In rejecting the government's urging to incorporate a limitation by reference to another section of the application identifying Busk as the target of the investigation, the court reasoned:

> in contrast with the description in Bedford of a residence of the Bedfords, the warrant does not tell the officer whether Busk is the owner or possessor of the entire building, or the occupier of a single apartment.  Plainly Officer Massaro sought, and obtained, a warrant which authorized entry into all the apartments in the building if he should deem that necessary.  The conduct of the officers in using the warrant to gain entrance to the multiple dwelling house at No. 3119 shows unequivocally that they so understood their authority.

<u>Busk</u>, 693 F.2d at 31.  Because the warrant authorized entry into all the apartments in a multiple unit dwelling when probable cause had been shown for only one unit, the warrant failed to satisfy the particularity requirements of the Fourth Amendment.  <u>Id.</u>

Second, in <u>Maryland v. Garrison</u>, 480 U.S. 79 (1987), the Court recognized the need to accommodate for mistakes that were reasonable under the circumstances when a court is called upon to assess the propriety of a warrant authorizing a search within a multiple dwelling building under the particularity clause.  There, "Baltimore police obtained and executed a warrant to search the person of Lawrence McWebb and the premises known as 2036 Park Ave., third floor apartment."  <u>Garrison</u>, 480 U.S. at 80.  During both the time leading up to completing the application for the warrant and the initial efforts to execute it, the officers believed that there was only one apartment on the premises described in the warrant.  In the process of executing the warrant, the officers initially encountered McWebb in front of the building and used his key to gain access to the first-floor hallway and in turn to a locked door at the top of the stairs to the

third floor.  When they entered a vestibule on the third floor, they encountered Garrison, who was standing in the hallway area.  From their vantage point, they could see into the interior of both McWebb's apartment to the left and Garrison's on the right, as both apartment doors were open.  They entered Garrison's apartment and found heroin, cash, and drug paraphernalia before realizing that the third floor contained two apartments.  Up until that point all officers reasonably believed that they were searching McWebb's apartment.  Upon discovering that the third floor actually was divided into two units, the search of Garrison's apartment was discontinued and it was not further searched.  Id. at 81.

Garrison challenged the propriety of the search under the particularity clause.  In resolving that challenge, the Court articulated "a two-part inquiry, addressing (a) the validity of the warrant's issuance and (b) the validity of the warrant's execution."  People v. Luckett, 652 N.E.2d 1342, 1346 (Ill. Ct. of App.), appeal denied, 657 N.E.2d 632 (Ill. 1995) (citing Garrison, 480 U.S. at 84).  As to the validity of the warrant when issued, the Court made clear that the officers had a duty to narrow the warrant in accordance with what was known or should have been known to them based on the information available to them at the time and that subsequently emerging facts cannot be used to retroactively invalidate the warrant.  It opined:

> Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant.  But we must judge the constitutionality of their conduct in light of the information available to them at the time they acted.  Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued.  Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant.  The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.

Garrison, 480 U.S. at 85 (footnotes omitted).

Based on the objective information available to officers at the time the warrant was requested, the Court was satisfied with the Maryland courts' determination that the warrant was validly issued. The Court noted that arguments certainly could have been made that the officers should have been able to ascertain that there was more than one apartment on the third floor. Nevertheless, the objective information available at the time the warrant was requested supported the view that only McWebb occupied the third floor. Id. at 85 n.10. One officer had verified the address given by the confidential informant and determined that it contained multiple apartments. The officer further inquired with the local utility companies as whether there was a front, middle or rear room on the third floor and was told that "one third floor was only listed to Lawrence McWebb." Id. at 86 n.10. Additional inquiry with the local police resulted in records that matched the description given by the informant as to the address and physical description of McWebb. Based on a review of the objective information from the officers' pre-warrant investigation, the Court was satisfied that the warrant had been validly issued. Id.

Turning to the second inquiry, the Court opined that "the validity of the search of [Garrison's] apartment pursuant to a warrant authorizing the search of the entire third floor depend[ed] on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." Id. at 88. In other words, "an officer's reasonable failure to appreciate that a valid warrant describes too broadly the premises to be searched" does not violate the Fourth Amendment. Id. at 88. This is so because the standard governing warrants is one of probability, not certainty, and where ambiguity arises in the execution of a warrant, the Fourth Amendment affords "some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." Id. at 87. "But the mistakes must be those of reasonable men, acting on facts leading sensibly to their

conclusions of probability." Id. at 87 n.11 (citing Brinegar v. United States, 338 U.S. 160, 176 (1949).

The Court made clear that the officers' ability to search or to continue to search in an area beyond that authorized by the warrant was governed by what the officers knew or should have known as the execution of the search unfolded.  If the officers had known or should have known that the third floor contained two apartments before they entered the third floor, they would have obligated to limit their intrusion and search only McWebb's unit.  Id. at 86.  And they were "required to discontinue the search of [Garrison's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant."  Id. at 87.  Because the officers' execution was reasonably based on the honest and reasonable assumption that McWebb's apartment and the third floor were one and the same, "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment" and the evidence seized during the intrusion into Garrison's apartment was not subject to suppression.  Id. at 88.

Finally, the court in Ritter was presented with an appeal arising from the district court's erroneous determination that information gained during the execution of a warrant indicating the residence actually was a multiunit dwelling invalidated the warrant because it turned out to be overbroad.  The warrant had been issued for the entire residential grounds as identified by an arial photograph (the building and grounds).  The district court had rejected the defendants' contentions that the warrant was not supported by probable cause and failed to adequately describe the location to be searched, but reasoned "that, based on what the officers discovered as to the true character of the residence, the warrant did not describe with particularity the place to be searched."  Ritter, 416 F.3d at 260.  Citing to Garrison, the district court had held that "the

entry teams' discovery of multiple units inside the residence had essentially functioned to retroactively invalidate the search warrant."  Because this determination was at direct odds with the teachings of Garrison, the Ritter court proceeded to examine the officers' conduct pursuant to Garrison's framework.  Id. at 265.

As to the first inquiry regarding whether the officers had known, or should have known, that there were separate dwellings contained in the property pictured in the attachment to the warrant, the record indicated "the multi-unit nature of [the subject] residence was not known to officers prior to execution of the warrant."  Id. at 266.  It likewise indicated that officers "mere entry into the building's common areas was reasonable and lawful because the officers carried a valid warrant authorizing entry upon the premises."  Id.  In other words, "the warrant to search [the] defendants' residence was valid and it [was] undisputed that the warrant was directed specifically toward the property that officers did in fact enter."  Id.  Thus, the first constitutional concern under Garrison was not at issue and the court was satisfied that the officers entered the premises pursuant to a warrant that was valid when it was issued.

The record in Ritter was unclear clear as to whether the execution of the search had violated the Fourth Amendment.  The court opined that "once the officers knew or should have known of the error in what they encountered versus what was authorized by the warrant, they were obligated to either limit the search to those areas clearly covered by the warrant or to discontinue entirely their search."  Id. at 267 (citing Garrison, 480 U.S. at 87).  It was clear that the officers had continued to search after they realized the deficiency of the warrant.  It was unclear when in relation to the discovery of the evidence seized that realization had occurred and, more specifically, whether any of the evidence had been discovered beforehand.  Id.  Consequently, the Ritter court remanded for further factfinding regarding when in the execution of the search the multiunit nature to the residence was or should have been discovered and what

evidence, if any, had been discovered "while the police had a reasonable belief that the search was in compliance with the warrant." Id. at 269.

Here, by relying on Busk and the factual issues brought into focus, defendant challenges the validity of the warrant in that the officers did not limit the scope of the warrant to his apartment despite being aware of or having access to information that suggested other units existed within the structure identified in the warrant's search authorization clause.  In contrast, while acknowledging that the officers had some information which suggested the residence might contain separate units, the government highlights 1) the facts the officers did possess that supported a probable cause determination as to defendant's alleged drug sales, 2) the officers' verification that defendant lived at the residence, 3) the fact that someone inside the residence was letting the individuals in when they came to the front door, 4) that defendant appeared to be at the residence during the suspected drug transactions, and 5) the information in the Allegheny County Real Estate Portal to support its position that the warrant was not overly broad because the investigation indicated the residence was a "single-family dwelling" that was "occupied by [] defendant."  Based on this information, it urges the court to conclude that the officers had a reasonable belief that defendant occupied the entire residence when the application was presented to Judge Cashman and he did issue the warrant.  As a result, the government urges the court to follow Ritter and find that any ambiguity in the scope of the warrant as presented was consistent with the officers' reasonable beliefs from the investigation and they reasonably executed the warrant in accordance with the boundaries Ritter established regarding the same.

Ritter does not control defendant's challenge pursuant to the particularity clause.  There, the court was not confronted with a challenge contesting the validity of the warrant when it was issued.  Moreover, its disposition of the matters that were addressed cannot be interpreted as establishing the principle that all particularity challenges to the breadth of a warrant's search

clause are to be resolved exclusively by examining the reasonableness of the officers' conduct in executing the warrant.  To the extent the government contends otherwise, its position must be rejected.

Post <u>Garrison</u>, numerous courts have continued to recognize that "to satisfy the particularity requirement when a search involves a building with multiple, separate residency units, the warrant must specify the precise unit that is the subject of the search."  <u>United States v. Perez</u>, 484 F.3d 735, 741 (5th Cir. 2007) (citing <u>United States v. White</u>, 416 F.3d 634, 637 (7th Cir. 2005).  And "when a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit."  <u>United States v. Butler</u>, 71 F.3d 243, 249 (7th Cir. 1995); <u>accord</u> <u>United States v. Hinton</u>, 219 F.2d 324, 325–26 (7th Cir. 1955) ("For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses.  Probable cause must be shown for searching each house or, in this case, each apartment."); <u>see</u> <u>also</u> <u>United States v. Simpson</u>, 944 F. Supp. 1396, 1398 (S.D. In. 1996) ("searching two or more separate apartments in the same building is no different than searching two or more completely separate houses.").  Thus, the general rule continues to be "that a warrant that authorizes the search of an undisclosed multi-unit dwelling is invalid."  <u>Perez</u>, 484 F.3d at 741 (citing <u>United States v. Gilman</u>, 684 F.2d 616, 618 (9th Cir. 1982)).  [accord – u.s. --]

There are, of course, a few firmly established exceptions to the general rule invalidating a non-particular warrant to search a multiunit structure.  Such a warrant will be upheld "where (1) there is probable cause to search each unit; (2) the targets of the investigation have access to the entire structure; or (3) the officers reasonably believed that the premises had only a single unit."  <u>Perez</u>, 484 F.3d at 741 (citing <u>Garrison</u>, 480 U.S. at 85–86; <u>United States v. Johnson</u>, 26 F.3d 669, 694 (7th Cir. 1994); and <u>United States v. Gilman</u>, 684 F.2d 616, 618 (9th Cir. 1982)).

In the instant matter, the officers obtained a warrant to search the entire residence, but they did not maintain at the suppression hearing that there was probable cause to search the entire unit.  And the record does not contain sufficient evidence to support that exception. Compare Butler, 71 F.3d at 249 (affidavit submitted to issuing judge supported conclusion that all three floors of the multiunit building were under the control of the defendant and his entourage, thereby triggering the single unit exception to extend probable cause to the entire building); United States v. Johnson, 26 F.3d 669, 694–96 (7th Cir.), cert. denied, 513 U.S. 940 (1994) (opining that the "used as a single unit" exception is applicable where the target of the investigation or warrant exercised "dominion and control" over the entire building or had access to the entire structure); United States v. Gusan, 549 F.2d 15, 18 (7th Cir.), cert. denied, 430 U.S. 985 (1977) (warrant valid for entire residence where defendant had "dominion and control" over first floor and used it for access to a second floor gambling ring).  Further, while the warrant presented to Judge Cashman did identify the residence as a single-family residence and stated that defendant appeared to be using the main entry/front foyer of the residence to conduct drug transactions, the government did not seek to establish through the testimony and evidence submitted at the hearing that there was probable cause to believe defendant had access to the entire structure.  Instead, it took the position that up until the protective sweep was completed and the officers had a chance to secure the entire premises fully and begin to "catch their breath," the multiunit character of the residence was just not something that they were focused on or came to appreciate.   In other words, their failure to focus on and appreciate the multiunit character of the residence was the product of a reasonable but mistaken belief that the residence was only a single family residence.  Accordingly, we turn to defendant's challenge as it relates to this exception.

To succeed on a challenge brought under the first prong of <u>Garrison</u>, a defendant must establish that the warrant failed to describe the actual residence to be searched with particularity. <u>United States v. White</u>, 416 F.3d 634, 638 (7th Cir. 2005).  If this showing is made, then the defendant must show that the police knew or should have known, based on the information available at the time the warrant was issued, that the description in the search clause was overbroad.  <u>Id.</u>

The scope of the information to be considered in this analysis is limited to what the officers actually disclosed to the judicial officer as well as what they 1) knew and/or 2) should have known and 3) had a duty to disclose to the judicial officer as part of the application process. <u>Id.</u>  The details of the investigation that was conducted and what those details revealed or should have revealed to a reasonable officer under the circumstances are properly considered in the analysis.  <u>Id.</u>

Here, the warrant's search clause specifically provided as follows:

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, *etc*):

7224 ldlewild st. Pittsburgh PA 15208, Parcel ID:0174-F-00316-0000-00, a 3 story red brick row home with concrete steps leading to a covered porch and the front door.  The curtilage that surrounds the property.

Hearing Exhibit  No. 4 at 1.  Immediately below this was the following:

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown. Give alias and/or description)

Lynn Hargraves DOB: 10/02/1953

Hearing Exhibit  No. 4 at 1.

In the affidavit, Detective Dettling informed Judge Cashman that Officers Celender and Valazquez had been informed by a confidential source "that the aforementioned residence was distributing controlled substances.  The CS stated the male drove a green jeep.  Through our

investigation we learned that a green Jeep Grand Cherokee, PA tag KJF3922, which is registered to Lynn Hargraves Sr., with a registered address of 7224 Idlewild St. Apt. 3.  The identity of the CS will be memorialized by Officer Celender and Officer Velazquez."  Id.   The affidavit then recounted the witnessing of three separate incidents that occurred on that day between 11:08 a.m. and 11:27 a.m. where an individual approached the residence, gained access through the front door by someone inside, remained inside for a few minutes, and then left the residence.  Officers Celender and Velazquez's training experience led them to believe the individuals displayed signs of drug addiction.  Id.  The affidavit then recounted an incident involving a fourth individual approaching the residence, gaining access through the assistance of someone inside, leaving the residence within a few minutes and a subsequent stop of that individual, resulting in the discovery of a knotted bag of what appeared to be crack cocaine.  It also recounted an incident close in time wherein defendant came out of the residence to meet someone in vehicle stopped in front of the house; the individual handed defendant a plastic bag, which defendant placed in his pocket and walked away.

The affidavit provided the above information and stated the following in summary: "your affiant believes there to be probable cause to search the person of Lynn Hargraves (DOB 10/02/1953), and the address of 7224 ldlewild St Pittsbugrh PA 15208, and attached curtilage for evidence of the distribution of controlled substances. Your affiant respectfully requests that a Search Warrant be granted in furtherance of this criminal inquiry."  Id. at 4.

As is clear from the above, nothing in the search clause limited or restricted the officers' authority to search to any apartment or particular subunit within the structure or to any specific part or location within the residence under defendant's dominion and control.  Nor did the affidavit identify or highlight any ambiguity as to whether the residence was a multiunit dwelling.  It simply identified the entire house and the curtilage that surrounds it as what was to

be searched.  And it identified defendant as the owner, occupant or possessor of the entire

property identified in the search clause.  Judge Cashman was not asked to consider any other

information bearing on the scope of the property to be searched.  Finally, the summary requested

a warrant to search the entire residence at the identified address.

In contrast to what was disclosed, the officers had gained the following information

during the investigation.  First, the confidential informant had relayed that defendant was living

on the third floor.  Second, verification with Pennsylvania Department of Transportation

revealed that both defendant's motor vehicle registration and his drivers license indicated that he

resided in apartment number three at 7224 Idlewild Street.  Third, when defendant left the

residence during the surveillance, the officers witnessed a number of individuals coming and

leaving the house without the assistance from defendant and in a manner that did not appear to

be connected to him.

In addition to the above known facts, it is beyond doubt that the officers should have

known of the multiple mailboxes next to the front door.  The mailboxes were conspicuous to

anyone viewing the property from the public sidewalk or from a vehicle driving past the property

- provided one was looking to ascertain if there were mailboxes or other indicia of multiple

residential units visible on the front façade of the residence.  The presence of several garbage

cans on the side of the porch also would have been detected.[3]

Given that Detective Dettling omitted from the affidavit a number of facts which were

known from the investigation or should have been known upon simple inquiry, the inquiry under

Garrison becomes whether there was a duty to disclose those facts and/or signify to the issuing

judge that there was an issue to be considered as to the character of the residence and in turn the

---

[3] Of course, the presence of the garbage cans only augmented the above information bearing on
the character of the residence and would not in itself have supported an inference that there were
multiple dwelling units within the house.

scope of the search to be authorized by the warrant.  Other than highlighting that a warrant could be invalid based on information that was known or should have been known to the officers at the time the law enforcement officers acted, the Court's opinion in Garrison did not provide further insight on the nature a court's inquiry pursuant to such a challenge.

An established framework for examining the validity of a warrant in the face of a challenge that it was issued based on false statements of fact or omissions of material facts bearing on the same has developed under Franks v. Delaware, 438 U.S. 154 (1978), and its progeny.  Two district courts that have grabbled with challenges to the validity of a warrant pursuant to the first prong of Garrison have utilized the framework from Franks in resolving such challenges.  See Simpson, 944 F. Supp. at 1410-11 (utilizing the established understanding of materiality under Franks in analyzing whether misstatements in an affidavit were misleading as to the scope of the building/units to be searched); United States v. Wharton, 2014 WL 3943358, *13-18 (D. Md. August 12, 2014) (following the framework under Franks in analyzing whether omissions from an affidavit about the arrangements of a couple living in a house divided into separate living units invalidated a warrant).  While not directly on point, the framework under Franks dovetails the relevant inquiry in ascertaining under Garrison whether an officer had a duty to disclose omitted information in an affidavit to preclude it from being misleading, and, if so, whether the inclusion of the information renders the warrant invalid.  Accordingly, we turn to that framework.

In Franks, the Supreme Court recognized the right of a defendant to challenge a law enforcement officer's statements made in an affidavit submitted in support for a warrant.  Id. at 155-56.  This right was limited to challenging a "false statement knowingly and intentionally [made], or [made] with reckless disregard for the truth, [that] was included by the affiant in the

warrant affidavit." Id.   And relief in the form of suppression was limited to situations where the inclusion of such a statement is material to the finding of probable cause. Id. at 156.

In Franks, "the Court created a mechanism to allow a defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid." Yusuf, 461 F.3d at 383 (citing Franks, 438 U.S. 154).   In doing so, the Court limited its application to those situations where false statements or those made with reckless disregard for the truth are deliberately interjected into the warrant application process for the purpose of distorting or manipulating the information being considered by the judicial officer. Cf. Franks, 438 U.S. at 156 ("In the event that at that hearing the allegation of *perjury or reckless disregard* is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.") (emphasis added).

This principle also extends to material omissions.   United States v. Frost, 999 F.2d 737, 742-43 (3d Cir. 1993).   In this setting, "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000).   Again, the inquiry is concerned with an intentional or reckless distortion of the information being given to the judicial officer in an effort to create probable cause where it would not otherwise exist. Cf. Frost, 999 F.2d at 743 ("Thus, in order to secure suppression of the fruits of the search, a defendant must show both that bad faith or reckless disregard existed on the part of the affiant, and that there would have been no probable cause but for the incorrect statement."); Hawkins v. Gage County, Nebraska, 759 F.3d 951 (8th Cir. 2014)

("To prove a 'reckless disregard' [the defendant] must show that the omitted material would be clearly critical to the finding of probable cause.") (quoting United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993)).

The mischief sought to be addressed by Franks does not extend to a desire simply to withhold information from the judicial officer where it is not material to the task at hand.  Frost, 999 F.2d at 743; United States v. Calisto, 838 F.2d 711, 715 (3d Cir. 1988) (relief under Franks not warranted where an omission "was occasioned not by a scheme to deceive the magistrate about a material fact, but by a desire to withhold a fact not material to the magistrate's task"). For example, in Frost the court declined to hold that the decision to withhold a drug dog's failure to alert to a suitcase being carried through an airport involved police conduct within the scope of Franks.  The affiant omitted the information in conjunction with an airport interdiction.  He did so not in an effort to distort the probable cause inquiry, but rather due to the familiar technique of "scent masking."  In other words, the affiant indicated that had the failure to alert been included, he would have explained that the information was immaterial because "drug couriers often mask the scent of drugs in suitcases so that a drug sniffing dog will not alert."  Because the omitted information in its totality was "not inconsistent with the substantial probative thrust of information which [the detective] did include," relief under Franks was not warranted.  Frost, 999 F.2d at 744.

In Calisto, the court was confronted with a scenario where the affiant had purposefully omitted the number of individuals through which the relevant information had been relayed in order to protect the identity of the confidential informant.  The defendant maintained that without those details the magistrate formed the "misimpression that [the affiant] secured the information directly from the original confidential informant source, rather than third-hand through two other

law enforcement officers." Calisto, 838 F.2d at 715.  This omission was challenged as going to

the heart of the probable cause inquiry.  Id. at 714.

The court rejected the defendant's challenge as failing to show either an effort to distort

the information being presented to the judicial officer or the withholding of material information.

As noted above, the affiant had intentionally omitted the details recounting the multi-officer

communication of the information from the original source.  But in doing so the affiant had "no

intention of misleading the magistrate with respect to the original source of the information and,

indeed, had every reason to believe that the magistrate would receive an accurate description of

that original source."  Id.  The court cautioned that the affiant's good faith belief that he had

accurately recounted the facts about the reliability of the confidential informant could not be the

end of the matter.  It opined:

> We start with the fact that from Weniger's perspective, the affidavit was filed in good faith
> and accurately reflected the facts as he understood them.  We agree with Calisto, however,
> that this cannot end the matter.  If we held that the conduct of Weniger, as the affiant, was the
> only relevant conduct for the purpose of applying the teachings of Franks, we would place the
> privacy rights protected by that case in serious jeopardy.

Id.  Beyond this general concern, such an approach would invite the undesirable potential for

law enforcement officers to "insulate one officer's deliberate misstatement merely by relaying it

through an officer-affiant personally ignorant of its falsity."  Id. at 714 (quoting Franks, 438 U.S.

at 164 n. 6.

The Calisto court nevertheless determined that the judicial officer "could not have been

misled about the fact that the original source was a confidential informant or about the indicia of

his or her reliability" and thus the omitted information was not material.  Id. at 715, 716

("Because the only intent to mislead reflected in this record is the intent to conceal the

participation of two law enforcement officers as relayers of information from a confidential

source, a fact unimportant in the context of probable cause, and because the warrant would have

properly been issued if the omitted information had been supplied, we reject Calisto's argument that <u>Franks</u> requires suppression of the fruits of the challenged search.").

Here, the affidavit identified the entire residence as the premises to be searched. It contained the representation that defendant was the owner, occupant or possessor of that residence. And it summarized its contents as providing "probable cause to search the person of Lynn Hargraves (DOB 10/02/1953), and the address of7224 ldlewild St Pittsbugrh PA 15208, and attached curtilage for evidence of the distribution of controlled substances." It left no room for uncertainty or question about the information in the officers' possession that had a bearing on the scope of the search. In other words, it did not even hint that information was known that suggested or brought into question whether defendant had control over only one of multiple units within the structure.

In sharp contrast to the failure to disclose any conflicting information about defendant's ownership or control over the residence, the investigation had developed facts that indicated defendant had control over only one of multiple units within the structure. From the beginning, the CI had relayed that defendant was living on the third floor and selling drugs out of the residence. In attempting to verify the information supplied, the officers had checked with the Department of Motor Vehicles and learned that defendant's motor vehicle registration and driver's license both indicated he lived in apartment number three. During the surveillance conducted, defendant left the residence and the officers observed individuals coming and going from the residence in a manner completely independent of defendant. These known facts would have caused a reasonable officer to question whether there were multiple units within the structure, and a simple examination of the front façade of the residence pursuant to such an inquiry would have revealed the presence of the three mailboxes with designations on them for

separate apartments as well as a number of garbage cans that were suggestive of a multiunit dwelling.

The government sought to counter the import of the above at the suppression hearing by introducing screen shots reflecting the listing of the property on the Allegheny County Real Estate Portal and testimony from Detective Dettling that he reviewed the listing and observed that it listed the "Use Code" of the property as  "SINGLE FAMILY" and this, plus his and officer Celender's driving by the residence earlier in the day, caused him to conclude the residence was a single family residence.  The difficulty with this position is multifold.  First, the information on the real estate portal was not put in the affidavit or provided to Judge Cashman and thus it cannot be used to support a warrant lacking in  probable cause.  See Aguilar v. State of Texas, 378 U.S. 108, 109 n. 1 (1964) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention.") (citing Giordenello v. United States, 357 U.S. 480, 486 (1958) and 79 C.J.S. Searches and Seizures s 74, p. 872 (collecting cases)) and Hinton, 219 F.2d at 326 ("validity of the warrant is dependent on the facts shown in the affidavit before the issuing authority").

Even more important, however, is that the information on the real estate portal simply did not refute or otherwise undermine the information gained during the investigation that strongly suggested there were multiple living units in the house and defendant was occupying one of them on the third floor.  The information from the portal appears to have been entered on or sometime after 1989, when the property was sold to its registered owner (who is identified as a resident of Erie, PA).  Thus, there was no basis to assume it reflected up-to-date information about the practical use of the residence.  Nor is there any basis to assume that merely because that designation was used for assessment purposes, the designation carried with it a restriction against dividing the residence into subunits for occupancy.  And indeed, as the officers repeatedly

testified, it was very common in the neighborhood for owners and tenants to subdivide houses into apartments, boarding rooms, overnight rooms and so forth.  Of course, the protections enshrined in the text of the Fourth Amendment can extend to all of these types of "homes" in any event.  See, e.g., Simpson, 944 F. Supp. at 1405 (citing Garrison, 480 U.S. at 90 (Blackmun, J., dissenting) (Fourth Amendment protection applies to an apartment, "the equivalent of a single-family house"), Ker v. California, 374 U.S. 23, 42 (1963); McDonald v. United States, 335 U.S. 451, 454–55 (1948) (defendant's room in a "rooming house" treated as a home); Serpas v. Schmidt, 827 F.2d 23, 28 (7th Cir. 1987) (on-track dormitory rooms for racetrack employees were "homes" under the Fourth Amendment even though they were small, temporary, located near stables, and accessible to track authorities by master keys); see also Stoner v. State of California, 376 U.S. 483, 893 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding house, McDonald v. United States, 335 U.S. 451 . . ., a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.") (citing Johnson v. United States, 333 U.S. 10 (1948)).  Thus, to rely on the designation in the real estate portal in the face of the sequential and mounting information from the investigation indicating the residence contained rental subunits was unreasonable; and to use it to dismiss that information without further investigation focused on the actual character of the living arrangements within the structure cannot support the weight the government seeks to have it carry.[4]

Having determined that the affidavit contained misleading information and that the officers collectively were in possession of information that was material to the scope of the

---

[4] As is evident from the findings of fact recited above, the proposition that driving by the house could somehow fail to reveal the multiple mailboxes on the porch to a reasonable officer who actually was examining the property in the course of investigating whether it contained multiple subunits in the form of apartments or boarding rooms is rejected as unworthy of credence.  This assessment is based on the hearing exhibits and testimony and made as a finding that is independent from the information imparted by the view.

search requested under the particularity clause, the remaining inquiry is whether withholding the specific information from the affidavit rendered it invalid.  For the reasons that follow, we conclude that it did.

As Judge Hamilton aptly observed in <u>Simpson</u>, the Fourth Amendment protects people against unreasonable government intrusions into areas or locations where they have legitimate expectations of privacy and the Supreme Court's precedent makes clear that "[n]o where is an expectation of privacy more legitimate than in the home."  <u>Simpson</u>, 944 F. Supp. at 1405 (collecting cases).  In <u>Payton v. New York</u>, the Court opined that "[a]t the core of the Fourth Amendment, whether in the context of a search or an arrest, is the fundamental concept that any governmental intrusion into an individual's home or expectation of privacy must be strictly circumscribed."  445 U.S. 573, 582 (1980).  It further explained:

> The Fourth Amendment protects the individual's privacy in a variety of settings.  In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... homes ... shall not be violated."  That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  <u>Silverman v. United States</u>, 365 U.S. 505, 511 [81 S.Ct. 679, 683, 5 L.Ed.2d 734].  In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

445 U.S. at 589–590 (alterations in original).  And as noted above, that protection extends to unauthorized intrusions into all types of private dwellings where individuals choose to reside or establish a secluded living arrangement.

The protections afforded by the Fourth Amendment to reasonable expectations of privacy are accompanied by two additional requirements designed to safeguard against the overzealous use of government authority in the execution of executive functions.  These are the "oath or affirmation" and particularity requirements.

The issuance of a valid warrant is dependent upon a showing of "probable cause, supported by Oath or affirmation."  The purpose of this fundamental requirement is to "interpose[ ] a magistrate between the citizen and the police . . . so that an objective mind might weigh the need to invade [an individual's] privacy in order to enforce the law."  McDonald, 335 U.S. at 455.  In explaining the nature of this complimentary requirement, the Court cautioned against the notion that it should be viewed as a technical or burdensome formality.  It opined:

> We are not dealing with formalities.  The presence of a search warrant serves a high function.  Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police.  This was done not to shield criminals nor to make the home a safe haven for illegal activities.  It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law.  The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.  Power is a heady thing; and history shows that the police acting on their own cannot be trusted.  And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.  We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

Id. at 455-56.

Similar teachings were set forth in Johnson v. United States, 333 U.S. 10 (1948), where the Court explained both the central purpose served by the oath or affirmation clause and the protection achieved by the neutral balancing which it was designed to ensure:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.  Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.  Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing.  The right of officers to

37

thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

Id. at 13-4.  The Court has continued to reiterate the value of the essential protection effectuated by the components of the warrant requirement.  See, e.g., Gates, 462 U.S. at 240 (noting the essential protection of the warrant requirement is that a judicial officer be the neutral and detached individual to draw the inferences from the information available and determine the boundaries of the government's intrusion into areas of protected privacy); cf. Franks, 438 U.S. at 165 (recognizing the central function of a magistrate in fulfilling the warrant requirement in deciding the proper standards for evaluating a post-execution challenge to the veracity of the information presented in an affidavit).

As noted above, the particularity clause likewise plays a critical role in assuring that government intrusions into areas wherein citizens retain a reasonable expectation of privacy comply with the Fourth Amendment.  "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  Garrison, 480 U.S. at 84.  Nowhere does this clause impose a more important limitation on the use of use authority then in the arena of entering the homes of citizens.  Payton, 445 U.S. at 589-90.  And in the absence of an established exception, the failure to comply with the particularity clause with regard to undisclosed multiunit dwellings voids the warrant.  Busk, 693 F.2d at 31; Perez, 484 F.3d at 741; Garrison, 480 U.S. at 87.

In the setting of a multi-unit dwelling, satisfaction of the oath or affirmation requirement and the particularity clause require officers to present to the neutral judicial officer any known issues or recognized uncertainties concerning the scope of the requested search warrant.

Commitment of both the issuance of the warrant and its appropriate scope under the particularity clause are not matters reserved to the investigating officer's prerogative.  To the contrary, these "are decisions that must be made by neutral judges." Simpson, 944 F. Supp. at 1410; accord Wharton, 2014 WL 3943358, *15 ("it is the responsibility of the neutral judge to determine whether to issue a search warrant and, if so, the scope of that search warrant.") (citing McDonald, 335 U.S. at 455).  For that fundamental protection "to have any value, the police must be candid with the judge and tell the judge about the facts they know that are material to determining probable cause and the scope of the probable cause." Simpson, 944 F. Supp. at 1399; Wharton, 2014 WL 3943358, *15 (same) (citing Simpson and United States v. Williams, 737 F.2d 594, 604 (7th Cir.1984) ("If the government had unfettered power to pick and choose which facts to present to the magistrate regardless of how misleading the presentations were, the magistrate's review of the affidavit would be meaningless.").  Where the police obtain a search warrant "without giving the judge – the 'objective mind' – the relevant information they had that was critical to deciding the proper scope of the search," the resulting warrant is constitutionally overbroad. Simpson, 944 F. Supp. at 1410.

The affidavit here simply conveyed that the entire building was a single residential house under defendant's control.  It did not even hint at the possibility that defendant occupied or had control over less than the entire structure and its curtilage.  But from the beginning, the officers were aware from the CI that defendant was living on the third floor and selling drugs out of the residence.  Follow-up verification with the Department of Motor Vehicles indicated that defendant resided at apartment number three within the residence.  And during the surveillance, the officers observed individuals coming and going from the residence in a manner completely independent of defendant.  These known facts would have caused a reasonable officer to question whether there were multiple units within the structure and prompted a more thorough

examination of the character of the building.  A simple examination of the front façade of the residence pursuant to an inquiry focused on that character would have revealed the presence of the three mailboxes with designations on them for separate apartments.  The officers' testimony that they did not see the mailboxes or did not focus or pay attention to them prior to obtaining and/or executing the search warrant and clearing the entire house cannot be accepted as truthful or otherwise given credence as a reasonable oversight or mistake.

The information in the affidavit as to the single resident character of house was inaccurate and misleading.  Critical information bearing on the multiunit character of the residence and defendant's occupancy of only the third apartment was not submitted for Judge Cashman's consideration.  The failure to submit that information was at the very least conduct that was reckless as to whether the information bearing on probable cause as to scope of the authorized search was truthful and accurate.  This reckless conduct deprived Judge Cashman from even understanding that there was contrary information to be considered regarding the scope of the warrant to be issued and its compliance with the particularity clause.  The omission of this critical information displayed a reckless disregard for the accuracy of the content of the affidavit as it related to the scope of the requested warrant and deprived the issuing judge of the opportunity to evaluate the known information and circumstances and determine the proper scope of the search to be authorized based on a probable cause analysis regarding the same.  As such, the officers violated their obligation to be candid with the issuing judge and permit a neutral decision as to the probable cause showing regarding the scope of the requested search under the particularity clause.  A warrant issued under such circumstances is invalid under Garrison and cannot be used to justify the ensuing search.

Moreover, the fruits of the search pursuant to the invalid the warrant cannot be salvaged under the good faith exception to the exclusionary rule established in United States v. Leon, 468

U.S. 897 (1984).  Under the good faith exception, suppression of evidence is "inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993).  "The test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge's] authorization."  United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999) (quoting Leon, 468 U.S. at 922 n. 23).

While the mere existence of a warrant is typically enough to prove that an officer conducted a search in good faith, Leon, 468 U.S. at 922, the Third Circuit has recognized certain situations where an officer's reliance on a warrant nevertheless would be unreasonable and would not trigger the good faith exception.  United States v. Hodge, 246 F.3d 301, 308 (3d Cir. 2001).  Among these is the situation where the issuing judicial authority issued the warrant on a deliberately or recklessly false affidavit.  Id.  (quoting United States v. Williams, 3 F.3d 69, 77 n.4 (3d Cir. 1993)).

Here, the affidavit failed to include for the issuing judicial officer's consideration the critical information that was known or should have been known from the investigation regarding the place to be searched.  The failure to supply that critical information made the affidavit misleading as to the scope of search that was and/or should be authorized in accordance with the particularity clause.  Its omission was in reckless disregard for the truth of the information contained in the affidavit and to be considered by the issuing judicial authority regarding the scope of the warrant requested.  As the investigating officers and the affiant submitted the application in reckless disregard for the truth of the information to be considered in conjunction with the scope of the requested search, the haven of reasonable reliance and good faith under Leon has no application here.[5]

---

[5]  There is an open question as to whether the jurisprudence governing the good faith exception under Leon is even to be considered where a warrant is invalid under the first tier of Garrison.

Even assuming for the sake of argument that the analysis pursuant to defendant's motion should proceed to the second tier in Garrison, and for the purpose of assuring completeness of the record, the government's attempt to justify the execution of the search as proper under Garrison likewise must be rejected.   Both Garrison and Ritter recognized that "once the officers knew or should have known of the error in what they encountered versus what was authorized by the warrant, they were obligated to either limit the search to those areas clearly covered by the warrant or to discontinue entirely their search." Ritter, 416 F.3d at 267 (citing Garrison, 480 U.S. at 87).  Both Ritter and Garrison dealt with situations whereby a reasonable mistake made the breadth of the warrant too broad and that mistake was only discovered after entry into the multiunit dwelling revealed its true character in a manner made the error in scope one that would be apparent to a reasonable officer.  In such a situation, Garrison affords the officers the prerogative to decide whether to limit the search to only the unit for which there was probable cause to search as reflected in the warrant or to discontinue the search until the warrant was clarified and presumptively brought into compliance by a judicial officer.

In contrast to the situations underlying Garrison and Ritter, the officers here were aware of sufficient facts and circumstances before the search was commenced to place a reasonable officer on notice that the residence contained multiple apartments.  And these facts and circumstances would have made such an officer recognize that the requested search was overbroad and did not comply with the particularity clause.  Thus, in the absence of exigent or

---

Leon had been decided three years before Garrison, and while the two opinions address and carve out exceptions for the reasonable mistakes of officers when dealing in the hard realities of ferreting out criminal conduct, Garrison laid out its own independent framework for addressing such mistakes as they pertain to the breadth of a search warrant and/or the resulting search when they involve the scope of the requested warrant and searches within a multiunit dwelling.  The central prominence of the warrant and particularity clause in effectuating the protections embodied in the Fourth Amendment lend further credence to this proposition and suggest that Leon and Garrison independently govern within their distinctly different realms.  Thus, it appears that failing to clear the first prong of Garrison ends the inquiry in such circumstances.

other established circumstances for a warrantless search of the home, they were required to return to a neutral judicial officer and request that the warrant be reformed based on all of the known information bearing on the character of the structure.  Because exigent or other established circumstances for warrantless entry were not present and the officers did not return to the judicial officer to have the warrant reformed in scope to comply with the particularity clause, the resulting search cannot be saved by shoehorning it into the protections afforded by the second good faith exception under Garrison and Ritter.

Prior to executing the warrant, the officers gained additional information bearing on the multiunit character of the residence.  In addition having been informed by the CI that defendant lived on the third floor, verifying that his drivers' license and vehicle registration contained apartment number 3 in defendant's address, witnessing individuals coming and leaving the building independent of defendant, and having visual access to the mailboxes, the process of securing the residence from all sides had uncovered the three separate electrical meters on the side of the house.  Directly after this was discovered inquiry was made by Sergeant Marckisotto to Lieutenant Baker as to whether the house contained multiple units.  Further inquiry or investigation of the matter was not undertaken.  Within a short period of time the officers approached the front door, where the multiple mailboxes were, battered in the door and proceeded to enter each of the locked rooms on each floor, which locked rooms were in themselves indicative of separate living quarters within the house.

It would have been evident to a reasonable officer considering the character of the residence prior to entry that the residence was a multiunit dwelling unit.  It would have been evident to a reasonable officer considering the character of the residence that the information from the investigation and the outward indicia of the multiple mailboxes and electrical meters indicated the residence was a multiunit dwelling.  It would have been evident to a reasonable

officer considering the character of the residence that the residence was a multiunit dwelling unit upon entry into the foyer.  It would have been evident to a reasonable officer considering the character of the residence that the residence was a multiunit dwelling unit upon entry into the first locked room leading to a separate living quarters on the first floor and upon approaching each locked room containing a separate living quarters as they proceeded throughout the house. But like Busk, the officers here understood their authority to encompass access to the entirety of the building and, notwithstanding the additional information on the multiunit character of the residence that had come to light with each unfolding detail, they initially acted on and executed that authority to the fullest extent possible, as is readily evident from their entry into every space within the three floor house where a human could hide – both on the way up and on then on the way back down.  To suggest this somehow occurred as a result of a reasonable mistake or inadvertent oversight as to the character of the house defies logic and cannot be accepted as fact.

Moreover, the effort to invoke the safe havens of exigent circumstances or the need to conduct a protective sweep are unavailing.  The officers had secured all sides of the structure and had been at the residence for a substantial period of time prior to executing the warrant.  The residence had been under surveillance for much of the morning with the exception of only a few minutes after the soft grab of defendant occurred.  The officers headed back to the residence directly after defendant was seized and yelled up the block to the bystanders in the street.  They did not see anyone enter the house after returning to the house, which was within a block of where defendant was taken into custody.  Except for appearance of the individuals suspected of purchasing drugs inside the front door, there was nothing remarkable about any of the other observed individuals who came and left the residence in a manner that was independent of defendant.

In <u>Buie</u>, the Court held that in conducting an arrest pursuant to an authorized arrest warrant, the Fourth Amendment permits a cursory visual inspection of the suspect's home when the searching officers possess a reasonable belief that the area swept presents a danger to the officers or others on the premises.  494 U.S. at 327.  In other words, "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."  <u>Id.</u> at 337.

Our Court of Appeals has opined that during the course of effectuating an arrest of an individual within the home pursuant to an arrest warrant, "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  <u>United States v. White</u>, 748 F.3d 507, 511 (3d Cir. 2014).  Beyond that, "an officer may conduct 'a warrantless search of a home based on reasonable and articulable suspicion that the areas being searched may 'harbor [ ] an individual' who poses a danger to those present at the scene of the arrest.'"  <u>Id.</u>  (alteration in original) (quoting <u>Buie</u>, 494 U.S. at 334).

The information possessed by the officers at the time they executed the search warrant did not provide specific and articulable facts that all areas of the house might harbor an individual who posed a danger to the officers on the scene.  The CI did not inform the officers that defendant had weapons in the residence, was known to have weapons in the past or was known to have engaged in violent behavior.  The officers did not possess any information that suggested or indicated that defendant was known to possess weapons or had been seen with a weapon or was believed to have a weapon.  The officers did not possess any information that suggested or indicated that defendant had a history of violent behavior or was known to associate

with individuals known to engage in violent behavior.  The officers did not possess any information that suggested or indicated that any other individual in the residence was known to possess weapons or had been seen with a weapon or was believed to have a weapon.  Defendant did not have a weapon upon being detained or possess anything suggesting he had a weapon or had been associating with someone who had a weapon.

The only "information" that the officers possessed was that drug dealers generally are known to possess weapons as part of their drug trafficking activities and the Homewood section of the City where the residence is located is known to be a high crime area – with an open drug market being a few blocks away and violent crimes often occurring in the neighborhood.  They also heard defendant yell to bystanders to "go get Ray and tell him to go to my house" when they took defendant into custody.

To be sure, the above generalities and stereotypical conduct associated with the suspected criminal activity and the neighborhood area did supply a reason to be vigilant in assuring officer safety as the officers proceeded that day.  And it would be inappropriate to deprive the officers of any measures reasonably needed to assure their safety in carrying out their duties in combatting crime.  Nevertheless, the advanced generalities and stereotypical conduct associated with the suspected criminal activity and the neighborhood area were not based on and did not identify specific and articulable facts about defendant or anyone else that was known or suspected of being in the house at the time.  The officers had watched the house for a few hours and had not observed anyone come or leave whom they suspected or had reason to believe might be armed or dangerous.  The mere fact that defendant, in the course of being taken into custody on the street a block from his apartment, directed someone to tell someone else to go to the house did not supply information that an individual who could be armed or pose a danger to the officers had somehow made his or her way inside the house.  Nor did it augment the information specific to

the residence that the officers did possess in a manner that supplied specific and articulable facts that the residence might harbor someone who could pose a threat to their safety.  Neither the known attributes of defendant's specific suspected drug dealing nor the know attributes of the neighborhood in general supplied specific and articulable facts that an individual who had been seen with a weapon or was believed to have a weaponed was present or even might be present within the residence.

The officers did not seek to justify their sweep of the residence as an action based on specific and articulable facts and inferences that someone associated with the residence might be in the premises and pose a risk to their safety.  To the contrary, they repeatedly referenced defendant's calling out to bystanders and telling them to get Ray and tell him to go to the house. But to assume this was a specific reason to fear that an individual was being directed to go to the house to confront the officers or destroy evidence was speculative and cannot bear the weight the government would have it carry.  The proposition is akin to a stereotypical belief that anyone associated with defendant or the neighborhood in general very well may have had such intentions.  While reasonable suspicion is a less demanding standard, it still requires facts and circumstances specifically related to the situation confronting the officers at the time they acted. They lacked specific and articulable facts suggesting that an individual who might pose a danger to their safety in the execution of the search warrant was in the residence.

The government's invocation of exigent circumstances likewise falls short for supplying reasonable justification for the entry into the entirety of the house.  "A warrantless search of a home is [] permitted 'when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" White, 748 F.3d at 511 (quoting King, 563 U.S. at 460).  Among these is the need to make entry "to prevent the imminent destruction of evidence."  Kentucky, 563 U.S. at 460 (collecting cases).

The articulable facts and circumstances that were known to the officers directly before entry into the residence fall short of demonstrating reasonable suspicion that such an event was imminent. And they fall short of supporting any reasonable basis to believe that the destruction of evidence might be underway somewhere within the residence for the same reasons that justification for a protective sweep was lacking.  Consequently, the exigent circumstances exception for destruction of evidence cannot support the intrusion into the residence that was undertaken upon execution of the warrant here.

Finally, the court has not overlooked the fact that the overbreadth of the warrant and entry did not result in the search of property under defendant's control.  And indeed, had the information bearing on the multiunit character of the residence been presented to Judge Cashman or had the officers continued to secure the residence while returning to a judicial officer for an appropriate revision of the premises to be searched, the result would have been a valid warrant for the search of defendant's apartment on the third floor.  In other words, one could argue that defendant's rights were not harmed by the police conduct here because they had probable cause for and could have obtained a search warrant for his apartment.  And it is the search of that apartment that resulted in the seizure of the evidence defendant seeks to suppress.  But the Supreme Court and the courts of appeals have long recognized that a warrant that does not facially limit the search of a residence that consists of multiple living units is not valid when issued for failure to comply with the particularity clause.  Busk, 693 F.2d at 31 (collecting cases); Groh, 540 U.S. at 559 ("The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional.") (quoting Sheppard, 468 U.S. at 988 n.5; Bedford, 519 F.2d at 654–55 (a warrant "directed against an apartment house will usually be held invalid if it fails to describe the particular apartment to be searched with sufficient definiteness to preclude a search of other units

48

located in the building and occupied by innocent persons"); Jacobs v. City of Chicago, 215 F.3d 758 (7th Cir. 2000) (reversing dismissal of section 1983 action and holding that police acted unreasonably and in violation of the Fourth Amendment if, when they discovered that a building named in an otherwise valid search warrant contained multiple units, they failed to cease the search to determine which apartment unit properly was the subject of the warrant); United States v. Clark, 638 F.3d 89, 94 (2d Cir. 2011) (the confluence of the Fourth Amendment's probable cause and particularity requirements demand that "a search warrant for a multiple-occupancy building be supported by a showing of probable cause as to each unit"); United States v. Parmenter, 531 F. Supp. 975 (D. Mass. 1982) (warrant authorizing the search of an eight-apartment, three-story duplex void for lack of particularity where the police lacked probable cause as to all of the units); State v. Jackson, 313 Wis.2d 162, 756 N.W.2d 623 (App. 2008) (warrant authorizing search of a duplex was void because it did not specify probable cause to search a particular side of the duplex, nor did it state probable cause to search the entire building); State v. Marshall, 199 N.J. 602, 974 A.2d 1038 (2009) (search warrant for a two-unit apartment building lacked sufficient particularity where affidavit made clear that police did not know in which of two units the asserted criminal activity took place); 2 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.5(b), (6th ed. 2021) ("in the absence of a probable cause showing as to all the living units so as to justify a search of them all, a search warrant directed at a multiple-occupancy structure will ordinarily be held invalid if it describes the premises only by street number or other identification common to all the subunits located within the structure.") (collecting cases).  And there is ample justification for this general rule.  As the court in Hinton recognized:

> The affidavit in this instance did not justify the ensuing warrant, and the fact that no harm was done - the record in this case does not show whether harm in this sense was done or not - would not validate a warrant invalid because of its failure to 'particularly' describe the place to be searched.

We are not being overtechnical in this.  We are merely insisting, as we must, that in
issuing search warrants the requirements of the Fourth Amendment be met.  If innocent
people were actually subjected to an unjust search under the warrant in question here, as
might well be the case, it could still be argued that the defendants were not harmed thereby
and, thus, should not be able to challenge the warrant because its coverage was too broad.
The cases already cited make it clear that this argument has not been accepted by the courts
because they are determined to discourage the practice of issuing warrants without a
sufficient showing of cause, or, as in this case, when the cause shown does not cover as
broad an area as the command to search.

The record fails to show whether or not there were persons living in the building who
were not referred to in the affidavit, but that fact is not material to a decision here.  All we
need know is that the warrant was not valid when issued.  As a result the search was
illegal.  The trial court should have granted defendants' motion to quash the warrant and
suppress the evidence obtained thereby.

219 F.2d at 326-27 accord 2 SEARCH & SEIZURE § 4.5(b) ("Although [the upholding of a search

that was limited to only one unit upon execution] is sometimes explained on the ground that the

defendant does not have standing to object concerning an overly broad description covering

subunits occupied by others, that surely is incorrect.  To say that a defendant 'was not prejudiced

because the search did not extend beyond his apartment, would overlook the fundamental basis

of the constitutional requirements' and make 'admissibility depend on success of the search'

notwithstanding the fact the warrant 'vests the officer with selective discretion in determining

where he could search.'").  And enforcing this longstanding tenant of Fourth Amendment

jurisprudence is particularly appropriate here given the reckless failure to place the character of

the residence meaningfully before the neutral judicial officer for a probable cause determination

as to the appropriate scope of the authorization to search.

For the reasons set forth above, defendant's motion to suppress will be granted.  An

appropriate order will follow.

Date: February 18, 2022

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:    Douglas C. Maloney, AUSA
       Charles P. Hoebler, Esquire

       (*Via CM/ECF Electronic Mail*)